

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-30-2008

# Philmingo Jamison v. Atty Gen PA

Precedential or Non-Precedential: Precedential

Docket No. 07-1045

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Philmingo Jamison v. Atty Gen PA" (2008). *2008 Decisions.* Paper 429.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/429

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos: 07-1045
_____

PHILMINGO JAMISON,

Appellant

v.

EDWARD KLEM; DISTRICT ATTORNEY OF YORK
COUNTY;
ATTORNEY GENERAL OF THE COMMONWEALTH OF
PENNSYLVANIA

_____

Appeal from the District Court
for the Middle District of Pennsylvania
(Civ. Action No. 05-00831)
District Court: Hon. Christopher C. Conner

_____

Argued July 24, 2008

BEFORE: McKEE, FUENTES, and WEIS <u>Circuit Judges</u>,

(Opinion filed:   September 30, 2008)

LEO A. LATELLA, ESQ. (Argued)
Federal Public Defender
116 North Washington Street
Kane Professional Building, Suite 2C
Middle District of Pennsylvania
Scranton, PA 18503

Attorneys for Appellant


KATHERINE L. DOUCETTE, ESQ. (Argued)
WILLIAM H. GRAFF, JR., ESQ.
York County District Attorney
45 N. George Street
York, PA 17401

Attorneys for Appellee

Opinion

McKEE, Circuit Judge.

Philmingo Jamison was sentenced to five to ten years imprisonment after pleading guilty to two separate criminal cases involving drug offenses.  After unsuccessfully challenging his conviction in state courts, Jamison filed a *pro se* petition for

habeas corpus under 28 U.S.C. § 2254 in which he challenged the voluntariness of his guilty plea. The Magistrate Judge to whom the petition was referred issued a thorough Report and Recommendation recommending that habeas relief be granted. That Judge concluded that Jamison's plea was not knowing, voluntary and intelligent because Jamison was not advised of the mandatory term of imprisonment that his guilty plea subjected him to under Pennsylvania's indeterminate sentencing scheme. The District Court rejected the recommendation, and denied the petition because no Supreme Court precedent specifically requires that defendants be informed of the terms of an applicable mandatory minimum sentence before pleading guilty. The District Court thus concluded that the state courts' rejection of Jamison's claim was neither contrary to, nor an unreasonable application of, Supreme Court precedent.

For the reasons that follow, we will reverse.

3

**I. Factual and Procedural Background**.

In September 2000, Jamison was charged in two separate cases; one charged him with possession of cocaine and marijuana with intent to deliver, and the other charged him with possession of marijuana, driving without a license, and reckless endangerment. Prior to trial, the prosecutor offered Jamison the opportunity to plead guilty in exchange for a sentence of "4-8 years." Pursuant to the advice of counsel, Jamison rejected that plea offer.

However, Jamison eventually decided to enter an open guilty plea without executing any formal plea agreement. Thereafter, the Commonwealth completed a one-page form wherein the prosecutor wrote that the government would nevertheless still recommend: "4-8 years w/ mand."

On July 9th, 2001, the trial court conducted a change of plea hearing which began with the prosecutor stating:

4

[Jamison] has filled out a guilty plea colloquy. It is going to be a straight plea with a pre-sentence, other than the fact that we will run the recklessly endangering case concurrent with the drug case. He is facing a sentence by Judge Kennedy on a third-degree homicide, and we have no agreement as to whether these cases are concurrent or consecutive. Of course, we are going to ask for them to be consecutive, and we will be filing mandatory on the drug case.[1]

No other statements were made at the hearing regarding the mandatory minimum sentence, or the length of the sentence Jamison would be required to serve under state law as a result of the applicable mandatory minimum sentence. Moreover, other than the aforementioned reference to "filing mandatory . . .", Jamison was never informed that his plea required the judge to impose a sentence of imprisonment. On the contrary, during the hearing, the court told Jamison that because there was no

---

[1] Jamison was also facing charges pertaining to an unrelated homicide. He claims that he was primarily focused on those homicide charges, and he intended to plead guilty to the controlled substance charges if convicted of the homicide.

agreement with the Commonwealth, sentencing "is basically up to the court." The judge asked Jamison if he understood that sentencing was "basically up to the court," and Jamison affirmed that he did. The court then accepted Jamison's guilty plea. In doing so, the court implicitly found that Jamison was entering the plea knowingly, voluntarily, and intelligently.

Jamison also filled out and signed a written guilty plea colloquy. In that colloquy, Jamison acknowledged only that he was facing a maximum term of 20 years imprisonment pursuant to his plea.

Six days after Jamison entered the plea, the Commonwealth sent a letter to both Jamison and defense counsel. The letter stated in part:

> Based on your guilty plea to an offense at 35 P.A. C.S.A. 780-113 (a)(30) wherein the controlled substance, Cocaine, totaled 79.1 grams, a mandatory minimum sentence of 3 years, and $15,000 fine must be imposed, 5 years and

6

$30,000 if second or subsequent offense.[2]

On August 1, 2001, Jamison returned to the state trial court for a sentencing hearing. The prosecutor noted at the hearing that Jamison had a juvenile record for possession of cocaine with intent to distribute, and that he was therefore subject to a mandatory minimum sentence of 5 years imprisonment and a $30,000 fine. The court then informed Jamison that he had a right to make any statement that he "care[d] to make," but that he was not required to make any statement if he did not choose to speak.[3] Jamison responded that he "had nothing to say." The court then sentenced him to not less than five nor more than ten years for the cocaine conviction

---

[2]Jamison's attorney testified at a subsequent PCRA hearing that he never received this correspondence from the Commonwealth, and that he never discussed its content with Jamison. Jamison, acknowledged at the PCRA hearing that he received the letter but stated that his attorney never discussed it with him.

[3] Jamison was not asked whether knowledge of the mandatory minimum changed his mind about pleading guilty.

and imposed a fine of $30,000. The court also imposed a concurrent sentence of not less than two, nor more than four years for the marijuana charge. The sentences were consecutive to any sentence that was imposed on the conviction for third-degree homicide.

## A. State Court Decisions.

On June 5, 2002, Jamison filed a *pro se* petition under the Pennsylvania Post-Conviction Relief Act ("PCRA") in which he challenged *inter alia*, the validity of his guilty plea. Counsel was thereafter appointed, and a hearing was conducted. At that PCRA hearing, Jamison testified that prior to his guilty plea, he was not informed by anyone that his guilty plea subjected him to a mandatory minimum sentence, much less a mandatory minimum sentence of five years and $30,000 fine. Jamison further testified that when the prosecutor stated at the change of plea colloquy that she would be "filing a mandatory on the drug

8

case," he did not know what she was referencing. Jamison maintained that he did not know he was facing a mandatory minimum sentence of five years. "As far as she said, a mandatory, and that was it. I didn't know what mandatory would be filed. I didn't know I was subject to a mandatory minimum of five years and fine due to my second offense." Jamison testified that he would not have entered an open guilty plea if he had known that he would have to serve at least five years in prison as a result.

Jamison's PCRA testimony was confirmed by his trial counsel, Harold Fitzkee, Jr., who had been the York County District Attorney before returning to private practice. He testified that he never told Jamison that Jamison would have to serve at least five years in prison if he pled guilty. Fitzkee explained that he advised Jamison to enter an open guilty plea because, based on his knowledge of Jamison's prior record, he

9

thought Jamison would be better off with the court determining the sentence than accepting the four to eight years that the prosecutor was offering. Fitzkee also testified that he first learned that Jamison was subject to a mandatory minimum sentence of five years at the sentencing hearing, after Jamison's plea had already been accepted by the court. Fitzkee swore he never received the letter from the prosecutor stating that a mandatory minimum of five years in prison applied and he never discussed the mandatory with Jamison.

The PCRA court ruled that Jamison could not establish that his guilty plea was constitutionally infirm. The court first concluded that, as a matter of state law, the prosecutor's statement that the Commonwealth would be filing "a mandatory on the drug case" and the writing that the Commonwealth would recommend a sentence of "4-8 yrs w/ mand" were sufficient notice to inform Jamison of the Commonwealth's intent to seek

10

a mandatory minimum sentence. The court also concluded that even if notice was insufficient, the guilty plea was nevertheless valid because Jamison knew that he had no agreements regarding sentencing, and that the maximum sentence for his crimes was 20 years imprisonment and a fine of $200,000. The PCRA court concluded that this knowledge, and the fact that Jamison was sentenced to a term less than that 20 year maximum sentence, was sufficient for a knowing, voluntary and intelligent guilty plea. The Superior Court affirmed the PCRA court's denial of relief on different grounds without discussing the PCRA court's opinion. The Superior Court held that Jamison could not obtain relief because he did not plead actual innocence as required under state law. *See* 42 Pa. C.S.A. § 9543(a)(2)(iii).

### B. Proceedings in the District Court.

Jamison then filed a *pro se* habeas petition under 28

11

U.S.C. § 2254, challenging the voluntariness of his guilty plea. Jamison's petition was referred to a Magistrate Judge who held a hearing. During that hearing, Jamison testified that, prior to pleading guilty, he was not aware that he was subject to a mandatory minimum sentence of five years.[4]

The Magistrate Judge appropriately analyzed Jamison's claim under the deferential standard required by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"). Under AEDPA, a federal habeas court can not grant relief after a state court has rejected the petitioner's claim on the merits unless the state court's decision was "contrary to," or an "unreasonable application of," clearly established Supreme Court precedent. 28 U.S.C. § 2254(d).[5] The Magistrate Judge concluded that although no Supreme Court case precisely held that a defendant

---

[4] Trial counsel died before the hearing in front of the Magistrate Judge.
[5] For a more thorough discussion of AEDPA's standard of review, *see Mateo v. Superintendent S.C.I. Albion*, 171 F.3d 877(3d Cir 1999) (*en banc*).

12

must be informed of an applicable mandatory minimum sentence in order for a guilty plea to survive constitutional scrutiny, Jamison's claim for relief was nevertheless clearly governed by the Supreme Court's decision in *Boykin v. Alabama,* 395 U.S. 239 (1969).

The Magistrate Judge ruled that the state courts had unreasonably applied *Boykin* in concluding that Jamison's plea was based on a knowing, voluntary and intelligent waiver of his constitutional rights. The Magistrate Judge concluded that Jamison's plea was not knowing, voluntary and intelligent because Jamison was not given adequate notice of the five year mandatory minimum sentence he was subject to before he decided to plead guilty. The court reasoned that a "mandatory minimum sentence is an important circumstance that a defendant should be aware of and take into consideration in determining whether to plead guilty." The Magistrate Judge also found that

13

neither the statement by the prosecutor at the change of plea hearing that the Commonwealth would file a mandatory on the drug case, nor the statement that the Commonwealth would recommend "4-8 yrs w/mand" were sufficient to inform Jamison that he would have to be imprisoned for at least five years if he pled guilty.

As noted at the outset, the District Court rejected the Magistrate Judge's recommendation. That decision was based on the fact that no Supreme Court case has precisely held that a defendant must be informed of the applicable mandatory minimum sentence and the state court decisions were not contrary to, or an unreasonable application of, clearly established federal law.

This appeal followed.[6]

---

[6] Jamison's habeas petition included a claim for relief based on ineffectiveness of counsel. However, the Magistrate Judge ruled that that claim was procedurally defaulted, and Jamison does not appeal that ruling.

14

## II. Jurisdiction and Standard of Review

The Anti-Terrorism and Effective Death Penalty Act, 28

U.S.C. 2254(d), provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Thus, Jamison can not obtain relief in federal court unless

the state court decisions denying relief were "contrary to clearly

established Federal law, as determined by the Supreme Court of

the United States," or "involved an unreasonable application of

clearly established Federal law, as determined by the Supreme

15

Court of the United States." 28 U.S.C.A. § 2254(d)(1). Jamison contends that his guilty plea was not knowing and intelligent because he was not told that he was subject to a mandatory minimum prison sentence of five years prior to pleading guilty.

We conclude that Jamison's claim is governed by *Boykin v. Alabama*, 395 U.S. 239 (1969) and its progeny just as the Magistrate Judge ruled. There, the Supreme Court held that courts may not accept a guilty plea without first determining, on the record, that the guilty plea was the result of a knowing, and intelligent act done with sufficient awareness of the relevant circumstances and likely consequences. The Court explained:

[w]hat is at stake for an accused facing death or imprisonment demands the utmost solicitude of which courts are capable in canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence. When the judge discharges that function, he leaves a record adequate for any review that may be later sought.

*Id*. at 243-44; *see also Brady v. United States*, 397 U.S. 742, 749 (1970).

16

In *Boykin*, the trial court accepted the defendant's guilty plea to common-law robbery without asking the defendant any questions regarding the plea or the defendant's understanding of the consequences of pleading guilty.  On appeal, the Supreme Court reasoned that since a guilty plea constitutes a waiver of several fundamental rights, the validity of the waiver can not be presumed from a silent record.  *Boykin*, 395 U.S. at 243.  The Court noted:

> A majority of criminal convictions are obtained after a guilty plea.  If these convictions are to be insulated from attack, the trial court is best advised to conduct an on the record examination of the defendant which should include, *inter alia*, an attempt to satisfy itself that the defendant understands the nature of the charges, his right to a jury trial, the acts sufficient to constitute the offenses for which he is charged and the permissible range of sentences.

*Id*. at 244, n 7.

The Supreme Court reaffirmed *Boykin* in *Brady v. United*

17

*States.*  There, the Court stated that "[w]aivers of constitutional rights . . . must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." 397 U.S. at 748 & n.6.  Similarly, in *Henderson v. Morgan*, 426 U.S. 637 (1976), the Court invalidated a defendant's guilty plea because he was not informed that the intent to cause death was an element of the offense to which he pleaded guilty.  In doing so, the Court reiterated that a defendant "must be informed of the consequences of his plea."  426 U.S. at 650 (White, J., concurring) (citing to *Boykin*, 395 U.S. 238).

Here, without discussing the impact of *Boykin* or any of its progeny, the District Court concluded that Jamison's claim was not governed by any clearly established federal law because no Supreme Court case has specifically held that a defendant must be informed of a mandatory minimum sentence prior to

18

pleading guilty. However, that view of the AEDPA standard of review is myopic and constrained.

AEDPA's standard of deferential review is clearly forged from a respectful balance of the limitations imposed by considerations of comity on the one hand, and a recognition of the crucial role of federal courts under our ordered system of liberty on the other. In her concurring opinion in *Williams v Taylor*, Justice O'Connor explained:

> When federal judges exercise their federal-question jurisdiction under the "judicial Power" of Article III of the Constitution, it is "emphatically the province and duty" of those judges to "say what the law is." *Marbury v. Madison,* 1 Cranch 137, 177, 2 L.Ed. 60 (1803). At the core of this power is the federal courts' independent responsibility - independent from its coequal branches in the Federal Government, and independent from the separate authority of the several States - to interpret federal law. A construction of AEDPA that would require the federal courts to cede this authority to the courts of the States would be inconsistent with the practice that federal judges have traditionally

19

> followed in discharging their duties under Article III of the Constitution. If Congress had intended to require such an important change in the exercise of our jurisdiction, we believe it would have spoken with much greater clarity than is found in the text of AEDPA.

529 U.S. 362, 378-79 (2000).

If we were to uphold the District Court's view of how precisely a Supreme Court decision must resolve a given issue under AEDPA, only Supreme Court holdings arising from the identical presentation of a given legal issue would constitute "clearly established law." This would collapse the dual "unreasonable application of" and "contrary to" prongs of § 2254(d) into a single inquiry. If "clearly established" means the Supreme Court must have previously addressed the identical presentation of a given issue, any state court decision that does not follow that holding would necessarily be one that is "contrary to" that Supreme Court decision.

20

Moreover, we have never interpreted the standard of review in § 2254 to suggest that Congress intended habeas review to turn on whether the Supreme Court had previously decided an issue in a case involving a fact pattern that is identical to the facts underlying a habeas petitioner's claim for federal relief. For instance, in resolving claims of ineffective assistance of counsel, we have not applied AEDPA in a manner that suggests that its deferential standard of review turns on whether the Supreme Court has considered the precise act or omission alleged to constitute deficient performance of counsel under the Sixth Amendment. *See Moore v. Morton*, 255 F.3d 95, 107 (3d Cir.2001). ("Supreme Court precedent counsels that the reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant.") (internal

21

citations omitted).

Thus, despite the seemingly limitless combinations of acts and omissions that could give rise to a claim of ineffective assistance of counsel, the quality of counsel's representation is measured by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny. *See, e.g., Florida v. Nixon*, 543 U.S. 175 (2004) (applying *Strickland* to a claim that defense counsel's failure to obtain defendant's express consent to a strategy of conceding guilt at the guilt phase of capital trial constitutes ineffective assistance of counsel); *Williams v. Taylor*, 529 U.S. 362 (2000) (finding that *Strickland* constitutes clearly established law to decide petitioner's claim that his lawyer failed to investigate and to present substantial mitigating evidence to jury in death penalty claims); *Hill v. Lockhart*, 474 U.S. 52 (1985) (*Strickland* constitutes established law in deciding petitioner's claim that his lawyer provided ineffective

22

assistance of counsel for guilty plea).

Thus, we have never required the kind of precision and exactitude endemic in the District Court's application of AEDPA. *Boykin*, no less than *Strickland*, is established Supreme Court precedent, and both cases set forth controlling principles. *Strickland* proclaims that the Sixth Amendment affords an accused a right to effective assistance of counsel and holds that the right is violated when a defendant is prejudiced by counsel's deficient performance. *Boykin* affirms that the constitutional rights that are relinquished by a guilty plea can not be waived unless the waiver is knowing, voluntary, and intelligent. As we have already noted, the Court has explained that the *Boykin* inquiry "demands the utmost solicitude of courts" to ensure that the defendant "has a full understanding of what the plea connotes and of its consequences." *Boykin*, 395 U.S. at 243-44.

23

Thus, absent "a record adequate" to determine that a guilty plea is a knowing, voluntary and intelligent waiver, a reviewing court can not conclude that the guilty plea complied with constitutional safeguards. *Id*. at 244. Accordingly, just as we do not look beyond *Strickland* and its progeny for established federal law in Sixth Amendment challenges to assistance of counsel, we need look no farther than *Boykin,* and its progeny to find clearly established federal law here. Jamison's challenge to his guilty plea goes to the heart of the principle that was clearly established in *Boykin, Brady,* and *Henderson*.

### III. Application.

Thus, we must determine if the state courts' rejection of Jamison's claim was either "contrary to" *Boykin,* or "an unreasonable application" of its requirement that a guilty plea be a knowing, voluntary and intelligent act, undertaken with

sufficient awareness of the relevant circumstances and likely consequences. *See Boykin*, 395 U.S. at 242.

A state court decision is "contrary to . . . clearly established federal law" when it is "'diametrically different,' 'opposite in character or nature,' or 'mutually opposed'" to a holding of the Supreme Court of the United States. *Williams v. Taylor*, 529 U.S. at 406 (citation omitted). This happens when the state court ignores or misapprehends clear precedent and when it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Id*. The Supreme Court has held that the "state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decision contradicts them.'" *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. at 405-6).

25

In *Mateo*, we explained that an "'unreasonable application of' clearly established Supreme Court precedent encompasses [the following] three distinct scenarios:

> (1) the state court extends Supreme Court precedent to cover a new factual context in which application of the precedent is unreasonable; (2) the state court unreasonably fails to apply a precedent in a factual context that warrants its application; or (3) the state court applies the correct precedent, but unreasonably in light of the facts of the case before it. Of course, all three scenarios require a definition of "unreasonable"; in the Fourth Circuit's view, the habeas court must inquire whether "the state courts have decided the question by interpreting or applying the relevant precedent in a manner that reasonable jurists would all agree is reasonable.

*Mateo*, 171 F.3d at 887 (citing *Greenv. French*, 143 F.3d 865, 870 (4th Cir. 1998).

Here, the state courts did not ignore or misapprehend *Boykin*, because they clearly understood that guilty pleas must

26

be knowing, intelligent and voluntary.  Moreover, as the District Court noted, no Supreme Court case *expressly* mandates that defendants be informed of mandatory minimum sentences before tendering a guilty plea.  However, the state courts did unreasonably fail to apply *Boykin* in a factual context that warrants its application," and therefore those courts unreasonably applied that clearly established Supreme Court precedent.

The Pennsylvania courts ruled that Jamison was aware of the statutory maximum and knew that the prosecutor would file "a mandatory."  They therefore concluded that Jamison's plea was therefore knowing, voluntary and intelligent.  As noted earlier, at the guilty plea hearing, the prosecutor stated that the Commonwealth would be filing "a mandatory in the drug case," and the Commonwealth stated in writing that it planned to seek

27

a sentence of "4-8 years." The state courts concluded that this was sufficient notice of the mandatory minimum to allow for a valid guilty plea. Before discussing why this was an unreasonable application of *Boykin*, and its progeny, we must first explain the sentencing scheme in Pennsylvania, as it differs dramatically from the more familiar federal scheme. Pennsylvania "employs an indeterminate sentencing scheme." *Commonwealth v. Kleinicke,* 895 A.2d 562, 572 (Pa.Super.2006). Pursuant to that scheme, when a sentencing court imposes a sentence of imprisonment, it must impose both a minimum term of imprisonment and a maximum term. *Id. See also*, 42 Pa.C.S.A. § 9756(a). The minimum period of incarceration must not exceed one half the maximum. 42 Pa.C.S.A. §§ 9756(b), 9757.[7] Once the defendant completes the

---

[7] Such a scheme is called "indeterminate" because the term of imprisonment a defendant will actually serve is not determined. The defendant (and the sentencing court for that matter) knows only that he/she will be incarcerated for the minimum term and can

minimum term of incarceration, it is up to the Parole Board to determine when (and if) he/she will be released before serving the maximum sentence imposed by the court.[8]  Thus, the length of the defendant's incarceration is not known "at the moment of sentencing because the defendant may ultimately serve only the minimum, the maximum or any sentence between the two." *Kleinicke*, 895 A.2d at 572.  Statutes imposing mandatory minimum sentences such as the one Jamison was subject to "only . . . limit the sentencing court's discretion as to the minimum term, not as to the maximum term," *id.*, which must always be set by the Legislature.  *See, e.g.*,18 Pa.C.S.A. §§

---

potentially remain in prison until the maximum term is reached.

[8] The situation is slightly different if the maximum term of incarceration is less than two years as the sentencing court then retains discretion to release the defendant and the defendant does not come within the purview of the Parole Board. *See Commonwealth v. Romolini*, 557 A.2d 1073 (Pa. Super. 1989) ("it is the province of the Common Pleas judge whether to grant or deny parole on a . . . sentence of less than two years duration.") (*citing* 61 P.S. § 314, and *Commonwealth v. Fair*, 497 A.2d 693 (Pa. Super. 1985)).

29

1103,1105 (setting maximum terms for felony, misdemeanor and summary offenses).

Although Jamison was informed of the 20-year maximum sentence that his plea subjected him to, nothing on this record establishes that anything he was told by the prosecutor or the court (either separately or cumulatively) provided Jamison with sufficient information about the mandatory minimum sentence his plea exposed him to. We realize, of course, that the exact length of any mandatory minimum sentence may depend on facts that are not known when a defendant changes his/her plea. Here, for example, it was not clear at the change of plea hearing whether Jamison faced a three year mandatory minimum sentence, or a five year mandatory minimum. As is frequently the case, that could not be determined until a subsequent sentencing hearing. However, it was known that a finding of

30

guilt would expose him to a mandatory minimum sentence of either three or five years depending on his prior record, and he was never informed of that. Thus, when the trial court accepted Jamison's plea, Jamison had not been told that he would have to receive a sentence of at least three years imprisonment, and that he would have to serve at least five years if he had a prior conviction for a controlled substance.

The prosecutor's statement, "filing mandatory," was far too opaque a reference to inform Jamison that he may have to serve at least five years in prison if he pled guilty. Moreover, that statement was not made to Jamison, it was not part of the on-the-record colloquy, and Jamison was never afforded an opportunity to respond to it before pleading guilty. The representation that the Commonwealth would recommend a sentence of "4-8 years w/mand" suffers from the same infirmity.

31

To the extent that it provided Jamison with notice that a mandatory would be filed against him, it was incorrect and misleading information. Given the indeterminate sentencing scheme requiring a maximum that is at least twice the minimum as we have described, it is just as likely that this vague reference refers to a minimum of four years and a maximum of eight; a term of incarceration that the sentencing court was not even authorized to impose under Pennsylvania law given Jamison's prior controlled substance conviction.

If we can assume Jamison understood anything based on that representation, it is that his mandatory sentence would be less than the five years that the court actually had to impose. As noted earlier, the confusion was compounded by the court telling Jamison that "sentencing is basically up to the court," even though the court had no authority to impose any sentence less

32

than five to ten years in prison.

We have already explained that *Boykin* and its progeny require that an accused be aware of the "*direct* consequences" of a guilty plea. *Brady v. United States*, 397 U.S. at 755 (emphasis added) (citation omitted); *see also Steele v. Murphy*, 365 F.3d 14, 17 (1ˢᵗ Cir. 2004) (defendant need only be "fully aware of the direct consequences" of guilty plea) (citing *Brady*). We therefore reject the view that knowledge of the statutory maximum is sufficient to allow an informed choice to plead guilty. It is at least as important for the accused to be accurately informed of the minimum amount of incarceration that he/she will have to serve pursuant to a guilty plea. *Boykin*, explicitly included "the permissible range of sentences" as one of the factors that defendants must be aware of before pleading guilty. *Boykin*, 395 U.S. at 244, n.7 (advising trial courts to conduct

33

colloquy to satisfy itself that "the defendant understands . . . the permissible range of sentences.") (citation omitted). Clearly, a defendant must know the maximum sentence that could result from a guilty plea. *See Dalton v. Battaglia*, 402 F.3d 729, 733 (7th Cir. 2005) ("We can imagine no consequence of a defendant's guilty plea more direct, immediate, and automatic than the maximum amount of time she may serve as a result of her plea."). The mandatory minimum is no less direct a consequence of a guilty plea. In fact, the mandatory minimum sentence may be far more relevant than the theoretical maximum because that is rarely imposed. Here, for example, counsel for Appellee conceded at oral argument that she knew of no instance of a maximum sentence being imposed during her four years as a prosecutor.[9]

---

[9] Moreover, the maximum sentence derived from totaling statutory maximums is often as fanciful as it is theoretical. For example, in *United States v. Powell*, 269 F.3d 175 (3d Cir 2001 ), the defendant was informed that the maximum period of incarceration was 830

34

The importance of the mandatory minimum prison term to making an informed decision is self evident here. Jamison testified at his evidentiary hearings that if he had known he was subject to a mandatory minimum term of imprisonment of five years, he would not have pled guilty to the charge, and nothing on this record undermines that testimony. In fact, the testimony is bolstered by Jamison's decision to reject the Commonwealth's offer of four to eight years, and neither the PCRA court nor the Magistrate Judge expressed reservations about Jamison's candor after he testified in support of his claim for relief. Thus, there is a distinct possibility that the failure to apprise Jamison of the mandatory minimum sentence affected his willingness to plead guilty when he otherwise would not have.

---

years. Although the court was not imposing a sentence pursuant to an indeterminate sentencing scheme, the 830 year maximum is nevertheless instructive of the extent to which the authorized maximum frequently bears no relationship to the sentence that is imposed.

The Commonwealth cites our decision in *Parry v Rosemeyer*, 64 F.3d 110, 114 (3d Cir. 1995), and notes that we there stated: "a maximum prison term and fine for the challenged offense are the only direct consequences of a state court plea." Appellee's Br. at 12. The District Court also cited this excerpt from *Parry* in concluding that Jamison did not have to be informed that he would have to serve at least 5 years in prison if he pled guilty. However, the references to this isolated statement in *Parry* misrepresent the analysis there. Parry was sentenced for violating the terms of a probationary sentence that had been imposed following his guilty plea. After being sentenced on the violation, he sought habeas relief arguing that his guilty plea was not knowing, voluntary and intelligent because he had not been informed that he could be incarcerated for violating his probation. On appeal, we had to decide "whether a judge's or defense counsel's failure to advise a

36

defendant offering a plea of guilty that, if he or she is sentenced to probation, his or her probation can be revoked if it is violated and a term of imprisonment substituted in its place. . .".  *Id*. at 111.  In that context we explained: "Due process does not . . . require that a defendant be advised of adverse *collateral* consequences of pleading guilty, even if they are foreseeable." *Id*. at 114 (emphasis in original).  We thus held that incarceration for a violation of the probation that is imposed pursuant to a guilty plea is a collateral consequence and due process does not require that an accused be informed of all that can happen upon violating probation before entering a guilty plea.  It was in that context that we made the statement the Commonwealth has seized upon.  However, the Commonwealth ignores the fact that, in context with holding that imprisonment for violating a term of probation was a collateral consequence of a guilty plea, we also explained that "[a] plea of guilty will

37

not be found to be unknowing and involuntary in the absence of proof that the defendant was not advised of, or did not understand, the direct consequences of his plea.". *Id*. at 114 (citing *Brady v. United States*, 397 U.S. at 755). We then stated,"'[t]he only consequences considered direct are the maximum prison term and fine for the offense charged.'" *Id.* We cited our decision in *United States v. Salmon,* 944 F.2d 1106, 1130 (3d Cir. 1991), *cert. denied,* 502 U.S. 1110 (1992), for that proposition. When *Parry* and *Salmon* are considered in context, it is clear that our holdings there are consistent with our analysis of Jamison's due process claim here.

In *Salmon*, like *Parry*, we held that a defendant need not be informed of the collateral consequences of a guilty plea. A defendant in *Salmon* argued that a prior conviction could not be used to enhance a subsequent sentence under the Guidelines

because, when he pled guilty to the earlier offense, he did not know that the plea could be used to enhance punishment for any subsequent crime under the applicable provisions of the Sentencing Guidelines. Not surprisingly, we rejected the argument. In doing so, we reiterated that "[d]ue process requires . . . a defendant be advised of and understand the *direct* consequences of a plea." 944 F.2d at 1130 (emphasis in original) (*citing Brady*, 397 U.S. at 755.). We added that "the only consequences considered direct are the maximum prison term and fine for the offense charged." *Id.* We explained that "the effect of a conviction on sentencing for a later offense under a career offender law is such a collateral consequence." *Id*. However, it can not seriously be argued that serving five years in prison pursuant to a mandatory minimum sentence is a "collateral" consequence of a guilty plea and not a *direct* result

of it.[10]  Indeed, as we have already explained, knowing the minimum length one will have to remain in prison is of perhaps greater importance than the maximum sentence.[11]

Finally, we conclude that Jamison's failure to withdraw his guilty plea at the sentencing hearing has no bearing on whether his plea was knowing, voluntary and intelligent when entered.  Based on our review of the transcript of the sentencing hearing, we do not believe that Jamison was afforded an

[10] In neither *Salmon* nor *Parry* did we have occasion to consider whether a mandatory minimum is a *direct* consequence of a guilty plea.

[11] We also reject the District Court's reliance on *Voils v. Hall*, 151 F.Appx 793, 795 (11th Cir. 2005).  We have steadfastly attempted to discourage District Courts as well as attorneys from relying on nonprecedential opinions of this court.  *See* Third Circuit Internal Operating Procedure 5.7 (indicating that "the court by tradition does not cite to its not precedential opinions as authority").  *See also*, *Fallon Elec. Co. v. Cincinnati Insur. Co.*, 121 F.3d 125, 128 n. 1 (3d Cir. 1997) ("[We] do not regard such opinions as binding precedent.").  We do not accept these opinions as binding precedent because, unlike precedential opinions, they do not circulate to the entire court before they are filed. Accordingly, not every judge on the court has had an opportunity to express his/her views about the opinion before it is filed.

Here, the District Court relied on a decision that is not only not precedential, it is not even a decision of a panel of this court. Accordingly, we will not explain why we think that decision is ill- advised and poorly reasoned.

40

adequate opportunity to withdraw his plea after the court told him about the actual length of the mandatory minimum sentence. Jamison was never asked whether he had any questions about the applicable mandatory minimum sentence or whether knowledge of it changed his mind about pleading guilty.

Under these circumstances, this record does not establish the knowing, voluntary, and intelligent guilty plea required by *Boykin*, and the state courts' rulings to the contrary was an unreasonable application of clearly established Supreme Court precedent.

## Conclusion

For the reasons set forth above, we reverse the District Court's denial of relief and we will remand to the District Court with instructions to issue a conditional writ.

41